Memorandum of Decision
On June 19, 1997, the Department of Children and Families (DCF) filed a petition to terminate the parental rights of Malik S. and Brandy S. to their minor son, Malik S. On September 11, 1997, the mother consented to termination. A trial of termination petition against the father took place in this court on April 26 and 27, 1999. For the reasons stated below, the court now grants the termination petition against the father.[2]
FACTS
The court finds the following facts and credits the following evidence.
 A. The Father
Malik was born on December 21, 1994. The father, who is black, and the mother, who is white, were not married at the time. They did marry shortly thereafter. But the marriage did not fare well. The couple argued frequently and, by March, 1996, divorce proceedings were pending. CT Page 6257
On March 14, 1996, Malik went to the hospital as a result of possible ingestion of adult strength tylenol. On March 15, Malik returned to the hospital due to bumps and bruises reported to be the result of abuse. The mother and father blamed each other for Malik's problems. DCF obtained a 96 hour hold. When DCF and the police informed the father, who was at the hospital, of their administrative action, the father became enraged and refused to turn Malik over. The father was arrested. He was ultimately convicted of breach of peace and received a suspended sentence and probation.
DCF placed Malik in the foster care of the Joyce 0. family, where he remains today.[3] On April 25, 1996, the father entered a nolo contendere plea to a neglect petition and the court committed Malik to DCF custody. The father agreed with placement of Malik in DCF care because it meant that Malik would not be living with his mother. The paternal grandmother, Myra C., declined to serve as a placement at the time because she felt that it would make the father overly dependent on her.
When visitation began in May, 1996, the father visited Malik consistently for about a month. By June, the father was arriving late for visits and, after July 17, 1996, the father failed to visit for approximately four months. Finances and transportation were a problem for the father, but DCF arranged for visits at an accessible location or provided transportation. During this time, the father had a job for approximately two months but then experienced periods of unemployment. He did not secure a stable residence and his whereabouts became unknown for approximately one month. He obtained a substance abuse evaluation, but did not follow through with its recommendation to obtain anger management counseling. Although the father did attend some parenting classes, he did not take advantage of DCF referrals to temporary employment agencies or of services offered through his criminal probation. The father blamed some of his misfortunes on racism but himself used a derogatory racial reference during a disagreement with one of his counselors.
The father visited Malik on several occasions during November and December, 1996, but declined a Christmas-time visit. The father's last visit with Malik was on January 8, 1997. The father missed one visit during this period only to be found elsewhere in town on the same day with some friends and, according to a witness, smelling of alcohol. In total, the father made only eighteen out of fifty-five possible visits. CT Page 6258
The father was arrested in November, 1996 and January, 1997 on several misdemeanor charges that apparently were alcohol-related. On the day of his January arrest, the father tested positive for cocaine and marijuana. On January 17, 1997, the father was sentenced to forty-five days in jail for violation of his earlier probation.
The father did not contact DCF during his incarceration. When he was released after about a month, the father did call DCF requesting visitation but did not leave a return phone number and DCF could not locate him. In the next several months, the father was arrested on three more occasions, ultimately on burglary charges. On October 22, 1997, the father, who been held in lieu of bail since May, was sentenced to four years execution suspended after eighteen months in prison.
On October 6, 1997, Dr. David Mantell, a clinical psychologist, conducted an evaluation of the father and Malik. The father was appropriate with Malik, but Malik did not maintain an interest in his father and ultimately stated that he did not know him. Dr. Mantell found no evidence of an ongoing relationship between the father and child. The evaluation report also concluded that the father suffers from a personality disorder with prominent antisocial traits and also from a history of polysubstance abuse then reportedly in remission. Dr. Mantell reported that the father has had multiple relationships, no consistent work, and repeated legal difficulties on account of impulsivity, poor judgment, and apparent criminal inclination.
In prison, the father failed to take advantage of rehabilitative programs because, according to him, he did not want anyone telling him what to do and did not believe in Alcoholics Anonymous. The father was paroled in January, 1998. DCF unsuccessfully attempted to locate him. In March, 1998, the father's attorney requested that DCF grant visitation or conduct an administrative hearing on that subject. DCF responded that it had left phone messages at various places for the father and that the father had not returned the calls or forwarded signed releases that DCF felt were necessary for assessment of the matter. The father did not formally pursue the matter thereafter. Other than some toys and clothes that the father bought for Malik early on, the father has not provided Malik any cards, letters, gifts, or financial support over the course of this case. He has requested visits but has not inquired about Malik's welfare. CT Page 6259
Apparently in the spring of 1998, the father obtained a full-time job, which he continues to hold. The father had been and continued seeking counseling on family issues from his pastor. He began to attend church regularly, to read the Bible, and to practice its teachings of respect for other people. He feels remorseful about his earlier mistakes and believes his morals have changed. He has strengthened once-strained relations with his mother and step-father.[4]
The father is currently renting an apartment. He loves Malik and seeks his return. If that is not feasible, he proposes to have Malik placed with the paternal grandmother, who is now willing to care of him.
 B. Malik
When Malik entered the 0. foster home at fifteen months of age, he would often sleep in the corner of the room with a bottle. He was very aggressive, clumsy, and accident prone. At first in preschool, he would not readily follow the rules.
Malik is now almost four and one-half years old. He has prospered. He learned in preschool that it was better to adhere to the rules than to lose out on privileges. From a clumsy baby, Malik has emerged as a young athlete who loves baseball, running, and most any sport. While Malik can still be oppositional, he is generally a friendly child.
The foster parents, who are white, have given Malik consistent care and attention. The mother stays at home with their four other children and the father is a teacher and coach. Malik has bonded with the foster parents and calls them Mom and Dad. He regards the three older boys and one younger girl, along with their grandmother, who also lives in the house, as part of his family. The foster parents love Malik and would like to adopt him.
TERMINATION ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child CT Page 6260 with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." General Statutes § 17a-112(c)(l). The court need not make such a finding, however, "if a court has determined at a hearing pursuant to subsection (b) of section 17a-110 [dealing with permanency planning for committed children] that such efforts are not appropriate." Id. Such a finding was made by Judge Swienton on March 18, 1998 in extending Malik's commitment to DCF to May 2, 1999.
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See Inre Michael B., 49 Conn. App. 510, 512, 714 A.2d 1279, cert. denied, 247 Conn. 919 ___ A.2d ___ (1998); General Statutes §17a-112(c)(3). General Statutes § 17a-112(c)(3) requires that, with one exception not pertinent here, these grounds must have existed for at least one year unless the court waives the one year requirement based on the standards set forth in §17a-112(d). In this adjudicatory phase, the court is limited to events preceding the filing of the petition or the latest amendment. See Practice Book § 33-3(a).
There being no amendments to the petition, the adjudicatory date in this case is June 19, 1997. DCF has alleged the grounds of abandonment, failure to rehabilitate, and lack of an ongoing parent-child relationship. The court finds that DCF has proven its allegations by clear and convincing evidence.
 1. Abandonment
General Statutes § 17a-112(c)(3)(A) provides that a ground for termination exists when "[t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child." "Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of the child." In re Mindalia M.,6 Conn. App. 194, 208-209, 504 A.2d 533, cert. denied,199 Conn. 809, 508 A.2d 770 (1986). Conversely, "where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern CT Page 6261 for the child's welfare, statutory abandonment has occurred." Id., 209. The statutory term "maintain" implies a "continuing, reasonable degree of concern." Id., 210.
The father did not maintain a continuing, reasonable degree of concern during the adjudicatory period. The father's visitation record is poor. At best his visitation was sporadic, which is not sufficient to defeat statutory abandonment. See Inre Rayna M., 13 Conn. App. 23, 36-38, 534 A.2d 897 (1987). Although the father's periods of incarceration obviously limited his opportunity to maintain contact with Malik, incarceration alone does not constitute a defense to abandonment. See In reJuvenile Appeal (Docket No. 10155), 187 Conn. 431, 443,446 A.2d 808 (1982). Other than a few items at the outset of visitation, the father has not provided any gifts, cards, letters, or financial support for Malik. He did not ask DCF about Malik' s welfare. The evidence clearly and convincingly establishes that for a period of over one year the father abandoned Malik.
 2. Failure to Rehabilitate
A second statutory ground for termination arises when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes § 17a-112(c)(3)(C). No dispute exists that the court adjudicated Malik neglected on May 3, 1996, thus satisfying one element of the statute.
The rest of the statute requires the court to find whether the parent has achieved "such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." General Statutes § 17a-112(c)(3)(C). The statute requires the court to analyze the parents' rehabilitative status "as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable `within a reasonable time.'"In re Luis C., 210 Conn. 157, 167, 554 A.2d 722 (1989). The statute, however, does not require parents to "be able to assume full responsibility for [a] child, unaided by available support systems." In re Juvenile Appeal (84-3), 1 Conn. App. 463, 477, CT Page 6262473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d (1984). Because of the requirement that the court predict what will happen within a "reasonable time" after the filing of the termination petition, it is sensible to conclude that the court can consider not only the parents' conduct before the filing of the termination petition, but also the conduct occurring after it.
During the adjudicatory period, the father did almost nothing to rehabilitate himself. He visited Malik only sporadically. He did not maintain consistent contact with DCF. The father made only token appearances in rehabilitative programs but did not show any initiative in enrolling in them or interest in completing them. He did not secure an adequate job or maintain a stable residence despite DCF encouragement to do so. He abused drugs and alcohol. Disturbingly, the father continued to commit crimes. The father, as he seems now to admit, had a bad attitude towards people.
Within a year after the filing of the termination petition, the father began to turn his life around. He obtained a steady job. He has participated in counseling with his pastor and now makes religion a part of his daily life. He has gained respect for family and neighbors. He recognizes the error of his past ways.
Whether this rehabilitation comes within a "reasonable time" after the filing of the termination petition is a question this court need not address. The father's rehabilitation, whether timely or not, is still not the type of rehabilitation contemplated by the statute. The required rehabilitation is one that "relates to the needs of the particular child." In re LuisC., supra, 210 Conn. 167. The father, even if personally rehabilitated, has no relationship with Malik. In the two or more years that the father took to start changing his lifestyle for the better, the father put Malik in the background. Malik understandably bonded with his foster family in the interim. For the father to attempt to become a responsible person to Malik at this point would constitute an unwarranted experiment with Malik's life that is certain only to disturb his now happy childhood. For these reasons, DCF has proven by clear and convincing evidence that, for a period of over one year, the father has failed to rehabilitate himself within the meaning of the termination statutes. CT Page 6263
3. No Ongoing Relationship
The third statutory ground alleged in this case is that there is "no ongoing parent-child relationship, which means the relationship that develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." General Statutes § 17a-112(c)(3)(D). This ground encompasses a situation in which "regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been completely displaced." In re Juvenile Appeal(Anonymous), 181 Conn. 638, 645, 436 A.2d 290 (1980) (internal citation omitted). "In either case the ultimate question is whether the child has no present memories or feelings for the natural parent." Id., 646.
Dr. Mantell's report establishes that Malik had no ongoing parent-child relationship with the father during the adjudicatory period. Indeed, at the evaluation Malik did not even recognize his father. To allow further time for the reestablishment of a parent-child relationship would not be in Malik's best interest because the father is essentially a stranger to Malik, who regards his foster mother and father as his parents. On this evidence, DCF has proven clearly and convincingly that, for over a year, there was no ongoing parent-child relationship between Malik and his father.
DISPOSITION
In the dispositional phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." General Statutes § 17a-112(c)(2). The court can consider all events occurring through the close of the dispositional hearing. Practice Book § 33-5.
The best interest of Malik S. clearly and convincingly requires termination of the parental rights of his father. Malik is lucky to have been taken out of the neglectful and unstable home of his natural parents and placed in the foster home of Joyce O. and her husband. While the father maintained an angry, CT Page 6264 anti-social lifestyle plagued by crime, substance abuse, and unemployment, the foster parents gave Malik the care and attention he needed. As a result, Malik has thrived. Malik has now spent most of his life with his foster parents. He has understandably bonded with them and their family. The foster parents would like to adopt. To prohibit this natural development would be to terminate the wrong parental relationship.
At trial, the father questioned the wisdom and propriety of placing Malik with a white foster family. The court finds that DCF's actions were consistent with federal law, which prohibits a person or government agency involved in adoption or foster care from "delay[ing] or deny[ing] the placement of a child for adoption or into foster care, on the basis of the race, color, or national origin of the adoptive or foster parent, or the child, involved." 42 U.S.C. § 1996b(1)(B).[5] The court recognizes the likelihood that Malik will experience some difficulties, perhaps in school or on the playground, in growing up as a child of mixed race living with white parents. But some of these difficulties might be experienced by any child of mixed race, regardless of the nature of his household. Further, the fact that Malik does not have the same racial makeup as his foster parents would also be true if DCF placed him in a completely black family. Thus some of these difficulties are inevitable, especially given the need to place Malik in foster care. To overcome these potential difficulties, Malik will need a strong foster family to provide him comfort and guidance. From all appearances, the foster family chosen by DCF satisfies these concerns.
In arriving at a decision, the court must consider and make written findings regarding seven factors set out in General Statutes § 17a-112(e). See In re Tabitha P., 39 Conn. App. 353,362, 664 A.2d 1168 (1995). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
Based on the foregoing discussion, the court finds that DCF provided foster care for Malik and offered the father regular visitation with transportation assistance. DCF also made referrals to a substance abuse agency, parenting classes, anger management counseling, and employment assistance. These services were relevant to the father's needs and were offered in a timely manner. CT Page 6265
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
On May 2, 1996, the court entered the following expectations for the father to meet: (1) keep all appointments set by or with DCF, (2) keep whereabouts known to DCF and your attorney, (3) visit the child as often as DCF permits, (4) participate in drug and alcohol counseling, parenting classes, and a psychological evaluation, and follow recommendations, 5) sign releases as requested, 6) secure and maintain adequate housing and income, 7) no substance abuse, and 8) no further involvement with the criminal justice system. As detailed above, DCF substantially met its obligation to provide assistance but the father's compliance with these expectations was poor, particularly during the adjudicatory period. Although the father argued that he had obtained the necessary counseling from his pastor, the pastor herself did not claim in her testimony that she had provided the father counseling for substance abuse or parenting skills. Further, the pastor did not have any special qualifications in these areas and did not refer the father to any experts who did.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
As stated above, Malik is bonded to his foster family. Malik does not recognize his natural father as his father.
5) The age of the child.
Malik is almost four and one-half years old.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent CT Page 6266 has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the court finds that father did not adjust his circumstances in time to make it in Malik's best interest to return to his home. The father did not maintain regular visitation with Malik or regular contact with his custodian.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
As discussed above, the father's difficulties stem primarily from his own lifestyle choices. The fact that he has now obtained steady employment despite his criminal record and substance abuse history proves that it is possible, although undoubtedly difficult, to do so when the will exists.
CONCLUSION
Based upon the foregoing findings, the court determines that it is in the best interest of Malik S. for a termination of parental rights to enter with respect to the father, Malik S. Because the mother, Brandy S., has already consented to termination, the court now grants the termination petition in its entirety. The court further orders that the Commissioner of DCF is appointed statutory parent for Malik for the purpose of securing an adoptive family. If the current foster parents are willing to adopt, it is the court's direction that they receive first consideration. The Commissioner shall file with this court no later than 90 days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
It is so ordered.
Carl J. Schuman Judge, Superior Court CT Page 6267
[2] The court will refer to the minor child as "Malik" and to his father as "the father."
[3] The record does not reveal the first name of Joyce O.'s husband.
[4] DCF presented evidence that, in a December, 1998 phone conversation, the father became belligerent and threatening with the DCF case worker and ultimately used a racial slur against him. The father denied using the racial slur, although he admitted that he can get argumentative. The court credits the DCF evidence but notes that the father's use of a racial slur is more consistent with the father's character prior to 1998 than after it.
[5] The Multiethnic Placement Act of 1994, which DCF cited at trial, was repealed on August 20, 1996 by Public Law 104-188,110 Stat. 1904. At the same time Congress enacted an amendment to the civil rights laws, now codified in 42 U.S.C. § 1996b, dealing with "interetbnic adoption." See Pub. L 104-188, Title I, § 1808(c), 110 Stat. 1904.